# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# Jacksonville Division

**SHELDON MAY,**
    **Plaintiff,**

v.                                         Case No.:

                                            **JURY TRIAL DEMANDED**

**JACKSONVILLE HOUSING
AUTHORITY,**
**a body corporate and politic,**
    **Defendant.**
_____/

## COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES, AND DEMAND FOR JURY TRIAL

**COMES NOW** the Plaintiff, **SHELDON MAY**, by and through his undersigned counsel, and hereby files this Complaint against the Defendant, JACKSONVILLE HOUSING AUTHORITY, as follows:

### PARTIES, JURISDICTION AND VENUE

1. Sheldon May is a 60 year old war veteran residing at 230 E 1st Street, Apartment 1015, Jacksonville, Duval County, Florida 32206.

2. He has lived at the same fourteen story apartment complex known as Centennial Towers for over fourteen years and his apartment is on the tenth floor.

3. The Jacksonville Housing Authority ("JHA") is a body corporate and politic established pursuant to Florida Statute 421.04 with its principal place of

business located at 1300 Broad Street, Jacksonville, in Duval County, Florida.

4. At all times relevant, it was authorized to transact business and exercise its powers by the Mayor and City Council of Jacksonville, Florida.

5. By statute, JHA acts through its Commissioners who are appointed by the Mayor and approved by the City Council.

6. Centennial Towers is listed on JHA's website as a high rise, senior community in the downtown historical Springfield area with 208 one-bedroom apartments.

7. According to the City of Jacksonville, Property Appraiser's Office, Centennial Towers is owned by JHA.

8. It was conveyed by special warranty deed by the City of Jacksonville in January 1995 to JHA and then again by corrective quit-claim deed dated July 6, 2020.

9. JHA is also the public housing agency ("PHA") that runs and manages Centennial Towers and other public housing in Jacksonville, Florida.

10. Mr. May brings this action for damages based upon the Defendant's violations of the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 et. seq. ("FHA") by failing to accommodate him and subjecting him to

different terms and privileges in violation of the FHA. He also claims violations of 29 U.S.C. [1]

11. Jurisdiction of this Court arises under 42 U.S.C. § 3613(a), (c), 28 U.S.C. § 1331 and § 1343(a)(3),(4).

12. Venue is proper in this district pursuant to 28 U.S.C. 1391(b).

## FACTUAL ALLEGATIONS

13. The FHA defines the term "handicap" as: "a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h)(1).

14. Mr. May has several medical diagnoses that rise to the level of "handicap" for purposes of the FHA.

15. He has a number of military service-related disabilities.

16. Those service-related disabilities include paralysis of the upper radicular nerve group, paralysis of the sciatic nerve and paralysis of the anterior crural nerve.

17. On January 13, 2021, he was diagnosed with bilateral osteoarthritis of the knee.

---

[1] According to HUD, Section 504 of the Rehabilitation Act and the Fair Housing act require the same analysis under this set of fact. *See* https://www.hud.gov/program_offices/fair_housing_equal_opp/disabilities/sect504faq, lasted visited November 22, 2021.

18. He was previously diagnosed with gout, arthralgia, lumbar spondylosis, all causing severe pain, weakness in his legs.

19. All these disabilities have been worsening over the last several years.

20. He has also been diagnosed with sleep apnea, chronic kidney disease and prostate cancer.

21. These impairments result in him being limited in his daily life activities of walking and standing, among others.

22. Mr. May's impairments are permanent conditions.

### *Rental Assistance Demonstration Program*

23. The RAD Program began in 2012, allowing projects funded under the public housing program to convert their assistance to long-term Project Based Vouchers ("PBV") under the RAD Statute.[2]

24. Tenants may be eligible for "Choice Mobility' a Housing Choice Voucher program after they have been a part of the PBV program for a full year.

---

[2] RAD is authorized by the Consolidated and Further Continuing Appropriations Act of 2012 (Pub. L. No. 112-55, approved November 18, 2011), as amended by the Consolidated Appropriations Act, 2014 (Pub. L. No. 113-76, approved January 17, 2014), the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. No. 113-235, approved December 16, 2014), the Consolidated Appropriations Act, 2016 (Pub. L. No. 114-113, approved December 18, 2015), the Consolidated Appropriations Act, 2017 (Pub. L. No 115-31, approved May 5, 2017), and section 237 of Title II, Division L, Transportation, Housing and Urban Development, and Related Agencies, of the Consolidated Appropriations Act, 2018 (Pub. L. 115-141, approved March 23, 2018) collectively, the "RAD Statute."

25. HUD outlines the general regulations and parameters of RAD in a RAD Notice which is revised as needed and most recently as of September 5, 2019. Notice H-2019-09 PIH 2019-23 (HA).

26. RAD conversions often involve a transfer of ownership to a private non-profit entity with the PHA retaining some control and may also include transfer to a private for-profit entity if the PHA retains management control of the project.

27. A stated goal of RAD is preservation and improvement of these properties through enabling access by PHAs and owners of private HUD assisted housing to Section 8 rental contracts to raise private and public debt and equity to address immediate and long-term capital needs.

28. PHAs are allowed to take a portion of their Section 8 voucher budget authority and "project-base" that authority. See section 545 of the Quality Housing and Work Responsibility Act of 1998 (Pub L. 105–276) approved October 21, 1998 (QHWRA) amending 42 U.S.C. 1437f(o).)

29. Project-Based Voucher rental assistance attaches to a unit and does not move with a tenant.

30. In contrast, at least 80% of a PHA's voucher budget must be allocated to Housing Choice Vouchers that belong to and move with a tenant. Those units may be owned by the PHA or by private owners or developers.

31. RAD transactions are governed by the same civil rights authorities that govern HUD-assisted activities generally. HUD 2016-17, PIH 2016-17 at 11, citing 24 C.F.R. § 5.105.

32. RAD transactions must also comply with the FHA and Section 504 of the Rehabilitation Act of 1973, ensuring that the PHAs make reasonable accommodations for people with disabilities affected by such transactions. HUD 2016-17, PIH 2016-17 at 11, citing 29 U.S.C. §§ 701 *et. seq.* and 24 C.F.R. part 8.

33. HUD's Guidance regarding fair housing and RAD conversions acknowledges the requirement to abide by its general guidance on reasonable accommodations made in conjunction with the Department of Justice. HUD 2016-17, PIH 2016-17 at 16.

34. HUD's Guidance regarding fair housing and RAD conversions acknowledges pursuant to the RAD Notice, households in the Converting Project who do not want to transition to the Choice Mobility program may be offered, if available, the opportunity to move to other public housing owned by the PHA and that such move shall be implemented as a prioritized transfer. HUD 2016-17, PIH 2016-17 at 62.

35. HUD's Guidance regarding fair housing and RAD conversions anticipates that reasonable accommodation requests seeking transfer by a tenant to another public housing property may be granted outside the planned RAD relocation process. 2016-17, PIH 2016-17 at 61.

36. According to HUD's most recent RAD Notice, "[w]hen using a site-based waiting list, PHAs should consider waiting list and transfer policies that expand opportunities for tenants seeking an emergency transfer under, or consistent with, the PHA's Emergency Transfer Plan. This includes allowing for easier moves between assisted properties. H-2019-09 PIH-2019-23 at 71.

37. A site-based waiting list means that the tenant must apply for admission at the project itself, is not a part of the public housing system and is limited to housing only at the specific site.

38. In early 2019, residents of Centennial Towers received a resident Information Notice from JHA regarding the RAD program.

39. JHA began holding meetings in or around the end of March, 2019 regarding the upcoming RAD conversion.

40. Nothing in the documents or meetings made residents aware that the type of rental assistance they would receive after the RAD conversion was changing.

41. In mid to late 2019, JHA again alerted the residents of Centennial Towers that it intended to undergo a RAD conversion of the public housing project.

42. JHA held additional meetings in mid-October 2019 to explain the RAD conversion at Centennial Towers.

43. The meetings addressed the inspection process pre-renovation, relocation during the renovations and general rights under RAD.

44. At no time was the difference in rights between PBV assistance and public housing addressed.

45. At no time during these meetings was the fact that JHA was moving Centennial Towers to a site-based admissions and that a tenant would no longer be considered a part of the public housing system at JHA or its implications addressed; nor were they informed that they would be required to sign a new PBV lease.

46. In April 2020, per HUD noticing requirements, JHA notified Centennial Tower's residents that HUD approved Centennial Towers for RAD conversion and issued a RAD Conversion Commitment dated April 7, 2020.

47. In that notice JHA stated that it is "signed by HUD, the property owner, and Jacksonville Housing Authority (JHA)."

48. The notice was the first time that tenants were notified that their "public housing lease will be replaced with a new Project-Based Voucher Section 8 lease."

49. Tenants also received notice that they had the right to return to their units after the renovation.

50. On or around April 22, 2020, residents of Centennial Towers received other notices regarding temporary relocation during renovation.

51. Mr. May had no understanding of RAD, the new lease process or the temporary location process.

52. Residents were to be moved out of Centennial Towers by floor and could be temporarily located to JHA units, at Centennial Towers or other locations, or to an extended stay hotel.

53. In December 2020, Mr. May was required to sign a new Project-Based Voucher lease to maintain his assistance and his right to housing.

54. Upon information and belief, construction began in late 2020.

55. Mr. May was offered several temporary units but none were suitable due to his disability and he was housed at an extended stay hotel during the renovations beginning on or around March 3, 2021.

56. On or around April 14, 2021, Mr. May, through counsel, requested that when he was moved back to JHA property that he be allowed a transfer to a first-floor unit owned or managed by JHA as a reasonable accommodation of his disabilities.

57. In support of his request, he provided letters from his treating physician stating he has "a painful foot and ankle condition and must be given lodging on the first floor" and "should limit his walking secondary to a painful foot and ankle conditions and should be afforded housing that does not require stairs."

58. Although his property manager seemed to be in support of the transfer, in a letter dated May 27, 2021, JHA, through his property manager, denied the request for a reasonable accommodation stating "[a]ll the apartments at Centennial Towers do not require stairs so no transfer is required to

meet this" and "[a]ll apartments at Centennial Towers are considered to be on the first floor with no stairs required. No transfer is required to meet this."

59. The letter also stated, "[l]astly, based on the requirements of the Project Based Voucher program you are currently on, you may not transfer out of the building and keep your assistance."

60. Mr. May was required to move back to his previous apartment on the tenth floor of Centennial Towers in late June 2021 to keep his assistance.

61. He requires an elevator to get to and from his apartment.

62. None of the apartments at Centennial Towers are on the first floor as it is reserved for common space and other amenities.

63. In the three years prior to the RAD conversion, over thirty complaints were made by residents regarding the elevators being inoperable.

64. Since the RAD conversion, the elevators have been consistently inoperable at times.

65. Currently the elevators are being "rehabilitated" and, although JHA stated that the rehabilitation was going to be done in phases leaving some elevator operable, they have been unusable for many days since Mr. May returned to his old apartment.

66. Mr. May is often trapped on his floor, essentially in his apartment, or cannot return home due to all elevators being inoperable.

67. He has been excluded from his home for hours on multiple occasions when he has returned home, and the elevators were not in service for an extended period.

68. On one occasion after waiting 3 hours in the lobby to use an elevator, he decided to walk up the stairs which was extremely painful and took over 20 minutes.

69. Getting down the stairs is equally difficult for Mr. May.

70. The elevators are also continually tied up, seven days a week, due to activities relating to the RAD conversion, such as moving and ongoing renovations.

71. Mr. May has observed Fire and Rescue using the stairs to get to a resident because the elevators were out of service.

72. Mr. May fears for his safety if a fire or some other emergency occurs in which he cannot or may not be allowed to use the elevators and fears being trapped or unable to escape a burning building.

**CLAIMS**
*FIRST CAUSE OF ACTION
FAILURE TO PROVIDE A REASONABLE
ACCOMMODATION
VIOLATION OF 42 U.S.C. § 3604(f)(3) and 29 U.S.C. § 794*

73. Defendant, through its actions and the actions of its agents, is liable to the Plaintiff by violating the federal Fair Housing Act of 1968, as amended, 42 U.S.C. §3601 et seq. by refusing to provide a reasonable accommodation of Mr. May's disabilities in violation of 42 U.S.C. §3604(f)(3)(B).

74. Defendant's unlawful actions were intentional, willful and implemented with callous or reckless disregard for Mr. May's civil rights.

75. As a result of the Defendant's discriminatory conduct, Mr. May has suffered injury, harm and damages.

### SECOND CAUSE OF ACTION
### UNEQUAL TERMS, CONDITIONS, OR PRIVILEGES
### VIOLATION OF 42 U.S.C. § 3604(f)(2) and 29 U.S.C. § 794

76. Defendant, through its actions and the actions of their agents, are liable to the Plaintiff by violating the federal Fair Housing Act of 1968, as amended, 42 U.S.C. §3601 et seq. by discriminating against her in the terms, conditions in the provision of services or facilities in connection with his home because of a handicap in violation of 42 U.S.C. §3604(f)(3)(B).

77. Defendant's unlawful actions were intentional, willful and implemented with callous or reckless disregard for Mr. May's civil rights.

78. As a result of the Defendants' discriminatory conduct, Mr. May suffered injury, harm and damages.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court grant her the following relief:

1. Enter a preliminary injunction enjoining Defendant from discriminating and ordering Defendant to provide a transfer to a first-floor unit suitable for Mr. May's disability as soon as one becomes available;

2. Enter a permanent injunction:

  a. enjoining Defendant and its directors, officers, agents, and employees from discriminating on the basis of physical handicap;

  b. directing Defendant to adopt a Reasonable Accommodation/Modification Policy which comports with federal, state and local law;

  c. directing Defendant and its directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future; and

  d. directing Defendant to post signs at all of their residential rental properties alerting tenants and potential tenants to their rights, including reasonable accommodation, under the Fair Housing Act;

3. Award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for injuries caused by the conduct of Defendants as alleged herein;

4. Award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendants for the willful, malicious, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

5. Award reasonable attorney's fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

6. Award such additional or alternative relief as may be just, proper and equitable.

## JURY DEMAND

Plaintiff May demands a jury trial on all issues which can be heard by jury.

RESPECTFULLY SUBMITTED,

By: */s/Suzanne Garrow*
Suzanne Garrow
Fla. Bar No.: 122184
Attorney for Plaintiff
Jacksonville Area Legal Aid
126 West Adams Street
Jacksonville, FL 32202
(904) 356-8371 Ext. 374
(904) 405-1976 Fax

## **VERIFICATION**

I, Sheldon May, in Duval County, Florida, declare under penalty of perjury that the foregoing facts set forth in this Verified Complaint are true and correct.

Executed on:

_11-23-21_
(Dated)

_/s/ Sheldon May_
Sheldon May, Plaintiff